Herbert BROWNELL, Jr., Attorney General of the United States, as Successor to the Alien Property Custodian, Petitioner,

v.

The NATIONAL CITY BANK OF NEW YORK, Respondent.

United States District Court
S. D. New York.
May 3, 1955.

J. Edward Lumbard, U. S. Atty., New York City, for petitioner. James H. Falloon, Dept. of Justice, Washington, D. C., of counsel.

Shearman & Sterling & Wright, New York City, for respondent. Chauncey B. Garver, Wm. Harvey Reeves, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

This is an action under Section 17 of the Trading with the Enemy Act, 50 U.S. C.A.Appendix, § 1 et seq., for the enforcement of a vesting order and turnover directive issued by petitioner. After an answer had been interposed in the action, both parties moved for summary judgment. These motions are now before the Court.

In 1925 and in 1928 the respondent became the indenture trustee for a series of bonds under which Allgemeine Elektricitats-Gesellschaft (hereafter "A.E. G."), a German corporation, was obligor. In 1933 A.E.G. defaulted on these obli-

gations, and the respondent, as trustee, commenced an action in New York in 1938 against A.E.G., obtaining jurisdiction over the nonresident corporation by attaching certain of its funds which are not the subject of the present action. A.E.G. then appeared generally, and respondent recovered judgment in 1939 exceeding four million dollars against A.E.G. No execution ever issued on this judgment. At the time of the commencement of the 1938 action, A.E.G. had an account with the respondent bank but these funds were never levied upon by the service of attachment papers in connection with the action. It is a portion of this bank account, in the name of A.E.G., containing the proceeds of certain Guatemalan bonds that the petitioner now seeks to recover as a "debt" owing to an enemy corporation.

On March 1, 1951 petitioner granted a license to respondent to apply the A.E.G. bank account funds held by it ($103,951) to the satisfaction of certain obligations of A.E.G. to respondent. Part of this account, the $60,403 here in issue, was to be for the satisfaction of services rendered after June 14, 1941— the date of the general freezing order [1] by the respondent as trustee of the A.E.G. bonds. Respondent then applied all the funds pursuant to the license. On April 9, 1953 petitioner revoked the license as to the $60,403 here in question which had been previously applied by respondent, and issued a vesting order as to it. A "turn-over directive" as to this fund dated April 15, 1953 was mailed to respondent, but it has failed to comply with it.

The respondent concedes that the usual action under Section 17 of the Trading with the Enemy Act is a summary proceeding to compel delivery of possession of enemy property seized by a vesting order and that the rights of claimants to such property must be asserted at a later time. A suit under Section 17 is a summary possessory proceeding which does not involve the determination of the actual title to the property. Special and exclusive procedures are provided in the Act to try the merits of claims to property seized in summary suits under Section 17. See 50 U.S.C.A. Appendix, §§ 9, 32 and 34.

"[T]he determination of the Custodian [of enemy ownership] is conclusive whether right or wrong. And it may be exercised by forcible seizure of the property or by suit and if by suit, the suit is purely possessory and must be yielded to; the right of any claimant being postponed to subsequent assertion. * * * The suit [under Sec. 17] was tantamount to physical seizure —gave preliminary custody such as seizure gives, and was intended to be not 'less immediately effective than a taking with the strong hand.'" Commercial Trust Co. v. Miller, 1923, 262 U.S. 51, 53, 55, 43 S.Ct. 486, 487, 67 L.Ed. 858; see, also, Central Union Trust Co. v. Garvan, 1921, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403; Stoehr v. Wallace, 1921, 255 U.S. 239, 245, 41 S.Ct. 293, 65 L.Ed. 604; Garvan v. $20,000. Bonds, 2 Cir., 1920, 265 F. 477; Miller v. Rouse, D.C.S.D.N.Y.1921, 276 F. 715, L. Hand, J.

Respondent contends, however, in its second defense in the answer, that since it had applied the $60,403 in the A.E.G. account pursuant to the 1951 license and had relied to its prejudice upon the grant of the license by disbursing some of the $60,403 to third parties and in doing other acts, the petitioner was estopped from revoking the license in 1953 and reinstating the status quo as it existed immediately prior to the 1951 license.

Section 5(a) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 5(a), permits the President, and petitioner by delegation, to "grant licenses * * * containing such provisions and conditions as he shall prescribe * * *; and he may revoke * * * such licenses

1. Executive Order 8389, as amended by Executive Order 8785, 6 F.R. 2897, 12 U.S.C.A. § 95a note.

from time to time * * *." It is clear that under this section, petitioner may revoke a continuing license as to tangible realty and chattels and may immediately vest such property after revocation. However, the situation in the instant case is vastly different. The petitioner granted a license to the respondent in 1951 to apply a debt owing to an enemy entity. This debt was subsequently applied and disbursed by the respondent in part to third persons.[2] Therefore, immediately before the revocation, the credit balance in the bank account in favor of A.E.G. having been eliminated pursuant to the license, there was no debt in existence. There being no debt, there was nothing which petitioner could vest in 1953. Only by artificially reviving the debt through the medium of an attempt in 1953 to revoke the license granted in 1951 could it be said that the debt which was extinguished in 1951 was reborn in 1953. However, the Court cannot find any support in the Act for giving petitioner such wide power to retroactively revoke if fraud was not practiced in obtaining the original license or if there was no failure to comply with the license provisions. This case does not present merely a question of administrative estoppel; see Davis, Administrative Law 594 et seq.; it presents a question of petitioner's powers under the Act. It is improbable that Congress intended to create a form of retroactive revocation entirely unknown in the prior general law of "licenses" without any indication in the Act that it was so drastically altering the nature of licenses. Cf. Restatement, Property, Sec. 519; Restatement, Torts, Sec. 254 and comment c. The instant case is not analogous to a hypothetical situation in which petitioner licenses a person to operate an enemy owned building and the operator expends large sums to rehabilitate the building for rental use. It does not follow that because improvements have been made, the Government is forever barred from vesting the building by revocation of the license. The instant case is more closely analogous to an attempted revocation of a license which permitted the operator to level the building. Once the building had been destroyed pursuant to such a license, the licensee could hardly be required by purported revocation to recreate the *status quo ante*. The revocation would be effective only prospectively to vest what remained of the building and its land at the time of revocation.

However, respondent is not entitled to an order on its motion for summary judgment. One of the "provisions [or] conditions", 50 U.S.C.A.Appendix § 5(a), upon the face of the original license in this case reads:

> "3. If this license is issued as a result of wilful misrepresentation on the part of the applicant or his duly authorized agent * * * the license may, in the discretion of the Director, Office of Alien Property, be declared *void from the date of its issuance* or from any other date." (Italics supplied.)

■■ Petitioner had the right to insert this provision in the original license, and respondent, by accepting the license with this provision upon its face is bound by it. It appears from the papers on this motion that petitioner is claiming that a wilful misrepresentation has been made by respondent.[3] On the other hand, re-

---

2. The Court has *assumed, for the purposes of this motion only,* that respondent's use of the term "application" in reference to the debt connotes a legally effective transfer of the A.E.G. credit balance to the exclusive dominion and use of the respondent which would be final apart from the purported revocation. In view of the disposition of these motions, the petitioner is not foreclosed from introducing evidence disclosing the actual underlying banking transactions that were involved in the "application" of the debt by respondent, if such evidence tends to negate the assumption herein made.

3. This appears from a letter from petitioner to respondent dated April 9, 1953:
"This Office issued the license based upon your statements that the Bank had a valid lien [upon the debt] resulting from the levy of attachments. Such statements were made by the Bank in

spondent claims that the license was granted upon full disclosure of all facts. A triable issue of fact has been raised which precludes summary judgment for the respondent.

Furthermore, apart from the revocation issue, the Court is not disposed at this time to hold as a matter of law in favor of respondent that its right of set-off, arising from its 1939 judgment lien against A.E.G. and the provisions of the trust indentures, may be asserted in a Section 17 possessory proceeding to defeat the summary seizure of an existing debt. See Clark v. Manufacturers Trust Co., 2 Cir., 1948, 169 F.2d 932, judgment vacated sub nom., McGrath v. Manufacturers Trust Co., 1949, 338 U.S. 241, 70 S.Ct. 4, 94 L.Ed. 31.

In addition, respondent claims that Section 8 of the Act, 50 U.S.C.A.Appendix, § 8, entitles it to summary judgment as a matter of law. Section 8 provides in part:

"Any person not an enemy * * * holding a lawful mortgage, pledge, or *lien, or other right in the nature of security* in property of an enemy * * * which, by law or by the terms of the instrument creating such mortgage, pledge, or lien, or right, may be disposed of on notice or presentation or demand * * *

*may continue to hold said property,* and, after default, may dispose of the property in accordance with law * * *." (Italics supplied.)

Respondent urges that its 1939 judgment lien (upon which execution never issued), and its trust indenture liens are within this section and therefore it "may continue to hold" the debt. This contention is without merit. Section 8 protects security interests in *specific* property and not interests in the general assets of an enemy. See Clark v. Manufacturers Trust Co., supra, 169 F.2d at 936. The 1939 judgment lien not only was general in nature but it attached only to "the real property and chattels real" of A.E.G. N.Y.Civil Practice Act, § 510. It does not appear from any of the papers on this motion that the contractual liens created by the trust indentures for the *A.E.G. bonds* were specifically intended to cover the A.E.G. bank account here in issue which contained apparently entirely distinct *"Guatemalan bonds"* and their proceeds. Furthermore, it does not appear from the papers that the A.E.G. bank account was to be held by respondent as specific security under the trust indenture for the payment of respondent's services and expenses as trustee for the A.E.G. bonds.[4]

Both motions for summary judgment are denied. So ordered.

---

documents filed with this Office and the Treasury Department. In this connection we call your attention to the statements made in your TFR-300 and 600 reports as well as your APC-56 and OAP-700 reports * * *.

"Examination of the facts and law involved in this matter have led us to conclude that the Bank either in its capacity as Trustee or otherwise, never caused the levy of a warrant of attachment to be issued against the funds involved nor did it acquire a lien against those funds by any other means.

"In view of the above considerations we hereby notify you that [the license] is hereby revoked in toto * * *."

The documents referred to in this letter are not all before the Court.

4. Respondent admits that the sheriff never served attachment papers upon the respondent in connection with the *commencement* of the 1938 action against A.E.G. Absent such a *levy*, upon the bank account here in issue, no specific lien upon the account was created at the commencement of the action. For a thorough discussion of the New York procedure for attachment and levy upon a bank account, see Zittman v. McGrath, 1951, 341 U.S. 446, 449–452, 71 S.Ct. 832, 95 L.Ed. 1096.