McGRATH, ATTORNEY GENERAL, as successor to
the ALIEN PROPERTY CUSTODIAN, v. MAN-
UFACTURERS TRUST CO.

NO. 11.

Argued October 12, 1949.—Decided November 7, 1949.

*Joseph W. Bishop, Jr.* argued the cause for the Attorney General. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Bazelon* and *James L. Morrisson.*

*Leonard G. Bisco* argued the cause for the Manufacturers Trust Co. With him on the brief was *Henry Landau.*

MR. JUSTICE BURTON delivered the opinion of the Court.

Numbers 11 and 15 are cross appeals from *Clark* v. *Manufacturers Trust Co.,* 169 F. 2d 932 (C. A. 2d Cir.).[1] Certiorari was granted in No. 11, on petition of the Custodian,[2] to resolve a conflict between the judgment below and that in *Clark* v. *Lavino & Co.,* 175 F. 2d 897 (C. A. 3d

---

[1] J. Howard McGrath was substituted for Tom C. Clark, as Attorney General, 338 U. S. 807.

[2] The term "Custodian" is used to refer either to the Alien Property Custodian or to the Attorney General who succeeded to the powers and duties of the Alien Property Custodian under Executive Order No. 9788, effective October 15, 1946, 1 C. F. R. 1946 Supp. 169.

Cir.). The conflict is confined to the Custodian's claim to the allowance of interest, in his favor, in a summary proceeding under § 17 of the Trading with the Enemy Act.[3] He claims interest from the date that his Turnover Directive [4] was served upon the Manufacturers Trust Company, here referred to as the bank, and computes such interest upon the sum which he ordered turned over. For the reasons hereinafter stated, we agree with the judgment below in its denial of interest. We granted certiorari also on the cross appeal of the bank in No. 15. This was to enable us to reexamine the pleadings and, if they were found to permit it, to consider the bank's claim that the District Court lacked authority to order it to turn over to the Custodian the principal sum in question, in the face of the bank's denial of its indebtedness to the enemy creditor for that sum, its claim of a setoff in excess of the alleged debt, and its claim to a lien upon the proceeds of the debt. We find that the record does not permit us to reach that issue.

February 1, 1946, the Custodian issued his Vesting Order No. 5791, 11 Fed. Reg. 3005, under authority of

---

[3] "SEC. 17. That the district courts of the United States are hereby given jurisdiction to make and enter all such rules as to notice and otherwise, and all such orders and decrees, and to issue such process as may be necessary and proper in the premises to enforce the provisions of this Act, with a right of appeal from the final order or decree of such court as provided in sections one hundred and twenty-eight and two hundred and thirty-eight of the Act of March third, nineteen hundred and eleven, entitled 'An Act to codify, revise, and amend the laws relating to the judiciary.'" 40 Stat. 425, 50 U. S. C. App. § 17.

[4] Issued under § 7 (c), 40 Stat. 418, as amended, 40 Stat. 1020, 50 U. S. C. App. § 7 (c), and Executive Order No. 9193, 1 C. F. R. Cum. Supp. 1174, as amended by Executive Order No. 9567, 1 C. F. R. 1945 Supp. 77.

§ 5 (b) of the Trading with the Enemy Act,[5] vesting himself with the following described "property":

"That certain debt or other obligation owing to Deutsche Reichsbank, by Manufacturers Trust Company, 55 Broad Street, New York, New York, arising out of a dollar account, entitled Reichsbank Direktorium Divisen Abteilung, and any and all rights to demand, enforce and collect the same, . . . ."

January 30, 1947, the Custodian served on the bank his Turnover Directive based upon his Vesting Order and thereby directed that the sum of $25,581.49, "together with all accumulations to and increments thereon, shall forthwith be turned over to the undersigned [the Custodian] to be held, used, administered, liquidated, sold or otherwise dealt with in the interest of and for the benefit of the United States."

October 29, 1947, the Custodian filed in the United States District Court for the Southern District of New York his petition against the bank seeking summary enforcement of his order under § 17 of the Act, *supra*. November 13, 1947, the bank answered.[6]

---

[5] § 5 (b), 40 Stat. 415, as amended, 55 Stat. 839, 50 U. S. C. App. § 5 (b), and Executive Order No. 9095, 1 C. F. R. Cum. Supp. 1121.

[6] The following parts of the answer are especially material to our decision in No. 15:

"7. Furthermore, by a vesting order the Alien Property Custodian can only vest property or a debt which was in existence at the time of the issuance of the Vesting Order. Manufacturers Trust Company did not hold any property for or on behalf of the Deutsche Reichsbank. The relationship between Manufacturers Trust Company as a depository and the Deutsche Reichsbank as a depositor of Manufacturers Trust Company is a debtor and creditor relationship. The existence of a debt from Manufacturers Trust Company to the Deutsche Reichsbank can not be predicated upon the status of a particular account. Manufacturers Trust Company can not be a debtor of the Deutsche Reichsbank unless the total of their mutual credits exceeds the total of their mutual debits. At the time of the

December 12, 1947, the District Court, without opinion, directed the bank to pay to the Custodian $25,581.49, *plus interest at 6% per annum from January 30, 1947.* The Court of Appeals for the Second Circuit struck out the interest but otherwise affirmed the judgment. One judge said he would have preferred to limit that court's holding to the point that the answer did not allege a sufficiently unequivocal claim to a setoff to raise that defense. Another dissented from the denial of interest. Petitions for certiorari were denied to both parties, January 17, 1949. 335 U. S. 910.

June 16, 1949, the Custodian asked leave to file a petition for rehearing and for a writ of certiorari on the ground that, on June 1, 1949, the Court of Appeals for the Third Circuit had decided *Clark* v. *Lavino & Co., supra,* in which it had expressly allowed interest to the Custodian under circumstances largely comparable to those in the case below. The bank asked leave to present its contentions

---

issuance of the Vesting Order No. 5791, Deutsche Reichsbank's indebtedness to Manufacturers Trust Company was in excess of $25,581.49 and therefore there was no debt owing from Manufacturers Trust Company to Deutsche Reichsbank arising out of the Reichsbank Direktorium Divisen Ab[t]eilung account. *The indebtedness of the Deutsche Reichsbank arose from the fact that Deutsche Reichsbank was upon information and belief, an instrumentality and part of the German Government. The German Government guaranteed to Manufacturers Trust Company the payment of debts of various German Banks to Manufacturers Trust Company. On June 1st, 1940 and June 14th, 1941, the indebtedness of the said banks to Manufacturers Trust Company, was in excess of $25,581.49.*

"8. In addition to the foregoing, Manufacturers Trust Company is advised by counsel that a lien of a bank on a depositor's balance for the amount of depositor's indebtedness to the bank is well recognized by law. Manufacturers Trust Company is further advised by counsel that Section 8 of the Trading with the Enemy Act recognizes the lien of any person who is not an enemy or an ally of an enemy and the lienor's right to realize thereon in satisfaction of the lienor's claims." (Emphasis supplied.)

should the Custodian's petition for certiorari be granted. All applications were granted. 337 U. S. 953.

## I.

The Trading with the Enemy Act is a war measure.[7] It creates powerful and swift executive and summary procedures particularly for the seizure of the property of enemies by legal process as an effective alternative to seizure by military force. The Act expressly provides for the seizure of enemy-held claims to money owed on debts. *Kohn* v. *Jacob & Josef Kohn, Inc.*, 264 F. 253 (S. D. N. Y.). Special proceedings are provided to try the merits of claims to property seized in such summary possessory procedures.[8] The present action is a summary

---

[7] "The Trading with the Enemy Act, whether taken as originally enacted, October 6, 1917, . . . or as since amended, March 28, 1918, . . . November 4, 1918, . . . July 11, 1919, . . . June 5, 1920, . . . is strictly a war measure and finds its sanction in the constitutional provision, Art. I, § 8, cl. 11, empowering Congress 'to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water.' . . .

"It is with parts of the act which relate to captures on land that we now are concerned. . . . [After discussing particularly §§ 7 (c), 9, and 12]:

"That Congress in time of war may authorize and provide for the seizure and sequestration through executive channels of property believed to be enemy-owned, if adequate provision be made for a return in case of mistake, is not debatable. . . . There is no warrant for saying that the enemy ownership must be determined judicially before the property can be seized; and the practice has been the other way. The present act commits the determination of that question to the President, or the representative through whom he acts, but it does not make his action final." *Stoehr* v. *Wallace*, 255 U. S. 239, 241–242, 245–246. See also, *Central Trust Co.* v. *Garvan*, 254 U. S. 554, 568; Rubin, "Inviolability" of Enemy Private Property, 11 Law and Contemp. Prob. 166 (1945).

[8] Section 9 (a) of the Act, 42 Stat. 1511, 50 U. S. C. App. § 9 (a), provides for the administrative consideration and allowance of claims to property transferred to the Custodian. A claimant also may sue

possessory proceeding under § 17.[9]   Section 16, which has accompanied § 17 in the Act since 1917, prescribes fines, sentences and forfeitures as special sanctions to punish willful violations of vesting orders or turnover directives as follows:

> "That whoever shall willfully violate any of the provisions of this Act or of any license, rule, or regulation issued thereunder, and whoever shall willfully violate, neglect, or refuse to comply with any order of the President issued in compliance with the provisions of this Act shall, upon conviction, be fined not more than $10,000, or, if a natural person, imprisoned for not more than ten years, or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall be punished by a like fine, imprisonment, or both, and any property, funds, securities, papers, or other articles or documents, . . . concerned in such violation shall be forfeited to the United States."   40 Stat. 425, 50 U. S. C. App. § 16.[10]

in a District Court for an adjudication of the validity of his claim. Section 32, 60 Stat. 50, as amended, 60 Stat. 930, 50 U. S. C. App. § 32, authorizes the administrative recognition of claims to property in the possession of the Custodian and § 34, 60 Stat. 925, 50 U. S. C. App. § 34, authorizes a procedure for the allowance, and payment to claimants, of debts owed by the person whose property has been seized by the Custodian. See also, *Central Trust Co.* v. *Garvan,* 254 U. S. 554, 568; *Garvan* v. *$20,000 Bonds,* 265 F. 477 (C. A. 2d Cir.); *Simon* v. *Miller,* 298 F. 520, 524 (S. D. N. Y.); *Kahn* v. *Garvan,* 263 F. 909, 916 (S. D. N. Y.).

[9] Petition filed October 29, 1947.   Order to show cause issued that day.   Answer filed November 13.   Case heard and decided that day.   Judgment entered December 12.

[10] See also, penalties for willful violation added to § 5, 48 Stat. 1, 50 U. S. C. App. § 5 (b) (3).   The Custodian may make the required Presidential determinations under § 7 (c).   "In short, a personal determination by the President is not required; he may act through

The Act makes no mention of interest charges in connection with the enforcement of these summary procedures. We recognize that, in the absence of express statutory provision for it, interest sometimes has been allowed in favor of the Government under other statutes when the Government's position has been primarily that of a creditor collecting from a debtor.[11] See *Rodgers* v. *United States*, 332 U. S. 371, 373, in which the rule was stated and interest disallowed. In the present case, however, we are not dealing with interest accruing to the Government upon contractual indebtedness or upon indebtedness such as that arising out of customs duties or taxes. We have here quite a different matter, the violation of a summary order of the Alien Property Custodian to turn over to him the physical possession of certain funds as a protective war measure. The Turnover Directive in the instant case is, in its essence, the same kind of an order as would have been issued to compel the delivery to the Custodian of the physical possession of a $25,000 bond owned by the Deutsche Reichsbank but held by the Manufacturers Trust Company in the latter's safe-deposit vaults. Statutory fines, sentences and forfeitures are prescribed for willful violation of such an order and, in the case of the bond, it is obvious that there would be no basis for the addition of an interest charge, computed at a statutory or judicially determined rate on the face or estimated value of the bond and running merely from the date of the Turnover Directive. Similarly, we find no basis for adding such an interest charge in the instant case.

the Custodian, and a determination by the latter is in effect the act of the President." *Stoehr* v. *Wallace*, 255 U. S. 239, 245; and see *Central Trust Co.* v. *Garvan*, 254 U. S. 554, 567.

[11] *E. g., Royal Indemnity Co.* v. *United States*, 313 U. S. 289, 296; *Billings* v. *United States*, 232 U. S. 261; see also, *Board of Commissioners* v. *United States*, 308 U. S. 343, 350, 352.

No claim of the Custodian for any interest accruing under the terms of the agreement of deposit is before us. The Custodian, in his Turnover Directive and in his petition, called for the delivery to him of the $25,581.49 owing to Deutsche Reichsbank on the date of the Vesting Order, February 1, 1946, together with all accumulations and increments thereon since that date. He made no showing of a contractual basis for any additions to such principal sum and, accordingly, judgment was rendered for the delivery to him of precisely $25,581.49, and no claim is made here that such sum is not the correct total amount of the indebtedness. The District Court, however, also ordered the bank to turn over to the Custodian 6% interest on $25,581.49 from January 30, 1947. This additional item reflected no terms of the deposit agreement. Whatever those terms may have been, they had not changed since February 1, 1946, so that any possible basis for the 6% interest from January 30, 1947, must be sought in the Trading with the Enemy Act. We find no authority in that Act for a 6% rate or for any other rate of coercive interest to be added as an incident to a summary order for the transfer of possession of funds. Accordingly, in No. 11, we affirm the judgment of the Court of Appeals, which omitted the interest.

## II.

In No. 15, the parties have discussed several questions which would have been presented if the answer had contained a denial of the alleged debt, an unequivocal plea of setoff, or a claim of a lien upon the Deutsche Reichsbank's interest in the debt or in its proceeds. The answer, however, did not present those issues and we do not consider them. When read as a whole, the answer did not deny the existence of the credit balance of $25,581.49 which the Custodian claimed was on deposit and which was the subject of the Custodian's Vesting Order. Nor

did it unequivocally assert a setoff. Instead, the answering bank alleged, on information and belief, that an offsetting indebtedness of the Deutsche Reichsbank to it arose from the fact that the Deutsche Reichsbank was an instrumentality and part of the German Government, that the German Government had guaranteed to the answering bank the payment to it of the debts of various German banks, and that, on the date of the Vesting Order, the indebtedness of said German banks to the answering bank was in excess of $25,581.49. Those allegations did not state that the Deutsche Reichsbank was *such* an instrumentality and *such* a part of the German Government as would make the Reichsbank automatically the guarantor of the debts of other German banks to the answering bank.[12] The answer did not even allege the status of the guaranteed debts to be such as to entitle the answering bank to resort to the alleged guaranty of their payment by the Deutsche Reichsbank.[13] The bank's claim to a lien upon the deposit depended, likewise, upon the inadequately alleged indebtedness of the Deutsche Reichsbank to it.

---

[12] For a description of the contemporary monetary and banking system of Germany and of the part played in it by the Deutsche Reichsbank, see Military Government Handbook, Germany, Section 5: Money and Banking, Army Service Forces Manual M356–5 Revised (March 1945), pp. 4, 66–73. For examples of differences between the liabilities of foreign public or semipublic corporations and those of the foreign governments to which they are related, see *United States* v. *Deutsches Kalisyndikat Gesellschaft,* 31 F. 2d 199 (S. D. N. Y.) and *Coale* v. *Société Co-op.,* 21 F. 2d 180 (S. D. N. Y.).

[13] 5 Michie, Banks and Banking (Perm. Ed.) §§ 126–128, and cases cited; 7 Zollmann, Banks and Banking (Perm. Ed.) §§ 4392, 4563, 4590. See also, restrictions on assertion, without a federal license, of any right of setoff which did not exist before June 14, 1941. Executive Order No. 8785, §§ 1. A. and 1. E., 1 C. F. R. Cum. Supp. 948, and see *Propper* v. *Clark,* 337 U. S. 472.

For the foregoing reasons the judgment in No. 11 is affirmed, and the judgment in No. 15 is vacated so as to permit such amendments of the pleadings or further proceedings as shall be consistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of either of these cases.